IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | )    1:02-cr-552 (LMB) |
| KENNETH LOUIS DAVIS, | ) |
| | ) |
| Defendant. | ) |

MEMORANDUM OPINION

Before the Court is defendant Kenneth Louis Davis's ("defendant") Motion for a Reduction of Sentence Under 18 U.S.C. § 3582(c)(1)(A)(i) ("Motion"), which defendant filed pro se, and which was supplemented by an additional memorandum after the Court appointed counsel to assist defendant. In the Motion, defendant argues that the length of his sentence compared with the sentence he would have received after the First Step Act ended the practice of "stacking" sentences for violations of 18 U.S.C. § 924(c),[1] and his record of rehabilitation while incarcerated, are extraordinary and compelling circumstances justifying a reduction in his sentence. In a Supplemental Motion filed with leave of court after briefing on the original Motion was complete, defendant argued that his serious medical conditions—and the risk that they created for him in light of the Covid-19 pandemic—were additional extraordinary and compelling circumstances, justifying his immediate release. The government has opposed both the Motion and the Supplemental Motion. Finding that oral argument will not assist the

---

[1] "Stacking" refers to the practice of charging a defendant with two separate counts of violating § 924(c) in the same case, and therefore triggering both a five-to-ten-year mandatory minimum for a first offense, and a 25-year consecutive mandatory minimum for a subsequent offense. "The First Step Act ended this practice … by clarifying that the 25-year mandatory minimum applies only when a prior § 924(c) conviction arises from a separate case and already 'has become final.'" United States v. McCoy, 981 F.3d 271, 275 (4th Cir. 2020). This change did not apply retroactively. Id.

decisional process, the Motion will be decided on the papers submitted. For the reasons that follow, the Motion will be granted, and defendant's 762-month sentence of incarceration will be reduced to time served.

In 2000, when defendant was 25 years old, he was out of work and living with a former co-worker, from whom he had to borrow clothing daily because he had only one outfit of his own. Presentence Investigation Report ("PSIR"), [Dkt. No. 119] at ¶ 14. On December 23, 2000, he told his former co-worker that "he was tired of not having any money," took a nine-millimeter gun to the Exxon gas station across the street, and robbed the store of $207 by holding the gun against the cashier's head and demanding that she empty the register. Id. at ¶¶ 13-15. On January 2, 2001, defendant and his co-worker together robbed a Texaco gas station, again threatening the store clerk with a gun, this time making off with $445. Id. at ¶ 16. On February 23, 2001, defendant and his co-worker robbed a High-Up Food Market of $6,550, during which robbery the defendant both held a gun to the head of the store clerk and hit her in the head with the gun, and then hit a store patron in the head with a gun as he was leaving the store. Id. at ¶¶ 18-20. On June 22, 2001, defendant committed his fourth and final robbery, of another High-Up Food Market, from which he and his co-worker took $340 after defendant brandished a gun at the store clerk on duty. Id. at ¶ 23-24.

Defendant was arrested on September 20, 2002, and on November 14 he was charged in a nine-count indictment with conspiracy to interfere with commerce by robbery in violation of 18 U.S.C. § 1951(a) (count 1); interference with commerce by robbery in violation of 18 U.S.C. § 1951(a) (counts 2, 4, 6, and 8); and four counts of using a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A) (counts 3, 5, 7, and 9). [Dkt. No. 119] at ¶ 4. A jury convicted him on counts 1, 2, 3, 6, 7, 8, and 9; counts 4 and 5 were dismissed on

the government's motion after the jury was unable to reach a verdict on the defendant's alleged involvement with the January 2 Texaco robbery. Id. at ¶ 6. On the conspiracy count and the Hobbs Act robbery counts, defendant was sentenced to 78 months. [Dkt. No. 124-4] at 2. He was sentenced to 84 months for his first § 924(c) conviction, and to 300 months for each of the second and third § 924(c) convictions, all to run consecutively. Id. In total, defendant was sentenced to a 762-month term of incarceration, of which he has now served approximately 223 months, and to a total of 5 years of supervision following his release. Id.; [Dkt. No. 39].

To be eligible for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A), a defendant must have first "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or 30 days must have passed from the warden's receipt of such an appeal. On February 12, 2020, defendant sent a request for a sentence reduction to the warden of USP Coleman II, where he is incarcerated, citing his stacked § 924(c) sentences. [Dkt. No. 117-3]. That request was denied on May 10, 2020. [Dkt. No. 124-3]. On July 19 and 27, 2020, while defendant's Motion was pending, defendant sent two additional requests to the warden, requesting compassionate release and citing the risk he faced from the Covid-19 pandemic in light of the serious medical conditions from which he suffers. [Dkt. No. 132-2] at 1-3. Those requests were denied on September 2 and 25, 2020. Id. at 4-7. Although the government argued in its first opposition brief that defendant had not properly exhausted his claims as they related to "his health and Covid-19" because his February 2020 request referred only to the issue of stacked sentences, the government did not contest in its opposition to the Supplemental Motion that defendant's July 2020 requests properly exhausted those issues. [Dkt. No. 126] at 26; [Dkt. No. 136]. Accordingly, all of defendant's claims are ripe for review.

In addition to meeting all administrative exhaustion requirements, an inmate seeking to modify a sentence under § 3582(c)(1)(A) must also show "extraordinary and compelling reasons to warrant [ ] a reduction" of the sentence, which must be "consistent with applicable policy statements issued by the Sentencing Commission." Defendant argues that this requirement is met because "the bulk of his lengthy sentence was not based on his criminal history, his role in the offense or the particular facts of his crimes," but rather, "was a result of enhanced mandatory sentences imposed pursuant to three simultaneously-charged convictions under 18 U.S.C. § 924(c)." [Dkt. No. 124] at 1-2. The First Step Act discontinued the practice of stacking § 924(c) sentences for convictions obtained in a single trial, although it did not extend the application of that amendment retroactively.

In its original opposition to the Motion, the government argued that courts could not consider stacked § 924(c) sentences as the basis for compassionate release for two reasons: because the applicable policy statement by the Sentencing Commission gives the power to identify "extraordinary and compelling" reasons justifying compassionate release only to the Bureau of Prisons ("BOP"), and because reducing a sentence due to § 924(c) stacking would be inconsistent with Congress's decision not to apply the First Step Act retroactively. [Dkt. No. 126] at 8 (citing U.S.S.G. § 1B1.13)); id. at 12. As the government acknowledges in its opposition to the Supplemental Motion, these arguments were both rejected by the Fourth Circuit in its intervening decision in United States v. McCoy, 981 F.3d 271 (4th Cir. 2020). [Dkt. No. 136] at 5. In McCoy, the court held that the Sentencing Commission guideline on which the government relied in its original opposition, which was adopted by the Commission before the First Step Act was passed, is not an "applicable policy statement" as defined by § 3582(c)(1)(A), because by its own terms it applies only to motions for compassionate release made by the BOP,

not those made by inmates directly. 981 F.3d at 280-83. The Fourth Circuit also rejected the government's argument that considering stacked sentences as a basis for compassionate release is contrary to congressional intent, finding instead that "[t]he fact that Congress chose not to make ... the First Step Act categorically retroactive does not mean that courts may not consider that legislative change in conducting their individualized reviews of motions for compassionate release under § 3582(c)(1)(A)(i)." Id. at 286. The Fourth Circuit concluded that a court conducting an "individualized determination[ ]" on the appropriateness of a sentence modification under § 3582 could take into account, among other factors, "the dramatic degree to which [a sentence] exceed[s] what Congress now deems appropriate." Id. at 288.

The government maintains that even if stacked sentences are a proper consideration for courts deciding § 3582 motions, compassionate release is not appropriate in this case because defendant has not shown "extraordinary changes in [his] personal circumstances that rise to the level of humanitarian considerations," [Dkt. No. 126] at 20; however, the Court finds that the disproportionate length of defendant's stacked sentences, in combination with his serious medical conditions, are extraordinary and compelling reasons justifying the modification of his sentence to time served.

In light of the specific circumstances of defendant's offenses, it is clear that his 762-month sentence is "disproportionate to both 'the seriousness of the offense and to what Congress now deems appropriate for this kind of conduct.'" McCoy, 981 F.3d at 279 (quoting United States v. Bryant, No. 95-202-CCB-3, 2020 WL 2085471, at *5 (D. Md. Apr. 30, 2020)). There is no question that robbery is a serious offense, and that defendant did real and meaningful harm to the individuals he threatened with a gun during the course of his robberies; however, that same extremely serious conduct would subject a defendant to a mandatory minimum sentence of

5

approximately 15 years if sentenced today. When defendant was sentenced, he faced a mandatory minimum of 57 years. Moreover, defendant had no serious criminal history[2] and was only 25 years old when he committed the robberies for which he is still incarcerated now, at the age of 45. [Dkt. No. 119] at ¶¶ 9-25, 44; see McCoy, 981 F.3d at 274 (affirming compassionate release in part based on the defendants' "lack of significant prior criminal history" and "youth at the time of the offenses"). Defendant's last robbery also occurred in June of 2001, more than a year before he was arrested in September of 2002, undercutting any argument that only incarceration could stop his criminal activities. [Dkt. No. 119] at ¶¶ 2, 23; cf. McCoy, 981 F.3d at 277 (affirming compassionate release for a defendant who used a firearm while committing a string of 12 robberies). Given these specific characteristics of defendant and his offenses, the sentence imposed differs to a "dramatic degree" from "what Congress now deems appropriate." Id. at 288.

Defendant's serious medical conditions provide an additional basis for a sentence modification pursuant to § 3582. See [Dkt. No. 126] at 20 (government acknowledging that the "heartland of compassionate release cases" includes cases in which defendants have "significant health issues" (quoting United States v. Gonzales, No. 05-cr-561(XR), 2019 WL 5102742, at *3 (W.D. Tex. Oct. 10, 2019)). Defendant suffers from grand mal seizures[3] which are so serious that

---

[2] Defendant's only previous criminal conviction was for second degree assault when he was 22 years old. According to his PSIR, he was working as a lifeguard, and got into an altercation with a pool patron who was attempting to bring alcohol into the pool. After a criminal complaint was filed against him, defendant "voluntarily responded to the police station," where he admitted to having struck the patron in the head, and explained that "he was only trying to protect himself as [the victim] made threats to him and had chased him in the parking lot of the pool." [Dkt. No. 119] at ¶ 44. Defendant was sentenced to two days in jail. Id.

[3] "A grand mal seizure causes a loss of consciousness and violent muscle contractions. ... [The condition] is caused by abnormal electrical activity throughout the brain." "Grand Mal Seizures," Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/grand-mal-seizure/symptoms-

the BOP has found that it is not safe for him to drive, or even to sleep on the upper bunk of a bunk bed. [Dkt. No. 124-4] at 5-6. Defendant reports that the same brain damage that causes his seizures has also left him with speech and vision problems and difficulty walking, and further contributed to mental health issues and insomnia that have caused him to lose more than 40 pounds. [Dkt. No. 132] at 9-10. Defendant also suffers from a number of conditions that place him at a higher risk for death or serious illness in the event that he contracts Covid-19 while incarcerated, including diabetes, high blood pressure, and asthma.[4] Although the BOP does not currently report any active cases of Covid-19 among the inmates at Coleman II, there are four staff members who are currently positive for the virus, which is particularly concerning given widespread resistance to Covid-19 vaccination efforts among prison staff[5] and the rising rate of new hospital admissions for Covid cases in the county where the facility is located.[6] Given the severity of defendant's chronic conditions, and the particular risk they pose to him in light of the Covid-19 pandemic, the Court finds that defendant's health problems are an extraordinary and compelling circumstance justifying a modification of his sentence to time served, as requested in the Supplemental Motion. Id. at 1.

Even after finding that there are extraordinary and compelling grounds for a sentence modification under § 3582(c)(1)(A)(i), a court still must consider any applicable 18 U.S.C.

---

causes/syc-20363458#:~:text=A%20grand%20mal%20seizure%20causes,electrical%20activity-%20throughout%20the%20brain. (last visited Apr. 26, 2021).

[4] See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html?CDC_A-A_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fpeople-at-increased-risk.html (last visited Apr. 26, 2021).

[5] See, e.g., "U.S. Prison Guards Refusing Vaccine Despite Covid-19 Outbreaks," ABC News (Mar. 15, 2021), https://abcnews.go.com/Health/wireStory/us-prison-guards-refusing-vaccine-covid-19-outbreaks-76461118.

[6] See https://covid.cdc.gov/covid-data-tracker/#county-view (last visited Apr. 26, 2021).

7

§ 3553(a) factors. As discussed previously regarding the disproportionality of defendant's sentence, the Court finds that the nature and circumstances of the offense, and the characteristics of the defendant, weigh in favor of compassionate release. 18 U.S.C. § 3553(a)(1). Defendant has served a significant term of incarceration—over 18 and a half years—that is an appropriate consequence for the serious offenses he committed; requiring him to serve an additional 45 years in prison is not necessary to "reflect the seriousness of the offense" or to "promote respect for the law." Id. at § 3553(a)(2)(A). Defendant having now served more than a year of his sentence under the particularly restrictive conditions imposed to limit the spread of Covid-19 within prisons further supports the conclusion that the sentence he has already served has been "just punishment for [his] offense." Id.

The need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment" further supports defendant's immediate release. 18 U.S.C. § 3553(a)(2)(D). As defendant correctly argues, given the numerosity and severity of his medical conditions and the limited care options available during prison lockdowns due to Covid-19, "he will be able to obtain more effective health care outside of prison." [Dkt. No. 124] at 29. As for his education and vocational training, defendant has made excellent use of the time he has already served, having completed over 100 courses, including in areas like food production, hospitality management, and computer skills that will improve his employment opportunities once he is released. Id. at 25; [Dkt. No. 124-4] at 2-4. Defendant has also been an active participant in the Threshold Program, a faith-based curriculum that "facilitates reintegration with society by helping inmates follow a moral compass, communicate effectively with others, and maintain relationships." [Dkt. No. 124] at 25.

In his Declaration, defendant explains that the courses he has taken and the Threshold

Program have given him the tools he needs to "respect [himself] and others[,] care for others, walk a non-violent path, think before reacting, [and] be a leader not a follower." [Dkt. No. 124-4] at 6. The letters of recommendation from BOP staff members indicate that defendant's growth has been manifested in his actions as well as his words. For example, Senior Office Specialist Rivera, defendant's work detail supervisor at Coleman II, writes that:

> Davis has performed at an outstanding level for a significant period of time, without incident reports or negative annotations on his work performance. Davis is an outstanding worker and demonstrates leadership abilities each and every day. ... Davis works with little supervision and is proactive when it comes to completing critically needed tasks [and he] performs additional tasks for staff from other departments well beyond the duties performed for my work detail.

[Dkt. No. 125-6] at 3. The mentor coordinator for the Threshold Program, Damond Talbot, confirms that defendant has not only improved himself, but also worked to improve his fellow inmates through guidance and mentorship. Talbot writes that "many look up to [defendant] as an elder," and that he "has become a mentor for inmates that are knuckleheads and really talks them out of doing dumb things." Id. at 5. Talbot concludes that defendant "really wants to make a difference" in his compound, and that although he is "an asset to [the program]," Talbot believes that "he could be an asset to his family more." Id. These recommendations from BOP staff are strong evidence that defendant's release would be consistent with the goals of the § 3553 sentencing factors.

Finally, defendant's lack of recent disciplinary incidents and concrete release plan support a finding that further incarceration is not necessary "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). The government submits that defendant has had "14 disciplinary reports[,] including an assault with a serious injury in 2006," [Dkt. No. 126] at 19; however, defendant has not had a single disciplinary report since January of 2015, and he has had no disciplinary reports involving violence in more than 13 years. [Dkt. No. 124-4] at 4-5.

9

Defendant represents that if he is released, he will live with his mother, who has attested that she will assist him "with all of his affairs, including medical appointments, financial arrangements, employment, and legal obligations." [Dkt. No. 124-7] at ¶ 3. Defendant's mother has also started the process of finding potential employers for her son if he is released, and has identified "several potential opportunities for [him], including employment in the food service industry or in a local mentorship organization." Id. at ¶ 4. The United States Probation Office has reviewed defendant's release plan and interviewed his mother and grandmother, and has approved his proposed living situation. Defendant's Motion also includes letters of support from many other family members and close friends, suggesting that upon release he will have a community that is actively engaged in providing him the support he needs to continue the self-improvement he has shown while incarcerated.

For these reasons, the Motion [Dkt. No. 117] and the Supplemental Motion [Dkt. No. 132] will be granted in an accompanying Order, and defendant will be released following a two-week quarantine to ensure that he does not pose a risk of spreading Covid-19.

The Clerk is directed to forward copies of this Memorandum Opinion to counsel of record and to U.S. Probation Officer Brooke Baber.

Entered this 27th day of April, 2021.

Alexandria, Virginia

/s/
Leonie M. Brinkema
United States District Judge